# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**CRAIG ALLEN,**<br><br>**Defendant.** | **Civil Action File No.**<br><br><br>**Jury Trial Demanded** |

## COMPLAINT

The plaintiff, Securities and Exchange Commission ("Commission"), files this Complaint and alleges the following:

## SUMMARY

1. Since at least 2019, Craig Allen ("Allen") has perpetrated a multi-million-dollar fraud through the hedge fund he advised and controlled, the Cheetah Fund L.P. ("Cheetah Fund").

2. During the period between approximately January 2019 and January 2023 ("the Relevant Period"), Allen raised about $9.9 million of investments in the Cheetah Fund. Throughout, he repeatedly lied to the fund's investors and potential investors. For example, Allen falsified the Cheetah Fund's track record of supposed investment success. He also issued to investors fraudulent Cheetah Fund

account statements showing supposed gains—thus prompting victims to invest more in the fund—when in fact Allen incurred over $4.59 million of realized trading losses in pertinent accounts at the fund's prime broker during the Relevant Period.

3.      Allen also misrepresented that a specific accounting firm served as the Cheetah Fund's "Auditor," circulated to investors forged letters from that accounting firm, and lied about a former NFL quarterback or the quarterback's family being Cheetah Fund investors.

4.      Further, Allen misappropriated a seven-figure sum from the Cheetah Fund and its investors.  Fund documents stated that Allen would receive a performance-based fee and reimbursement for legal and accounting expenses from the Cheetah Fund only when fund investors profited.  Even using a conservative estimate, Allen would have earned—at best—a minimal amount (if any) of such compensation from the Cheetah Fund.  Yet, Allen misappropriated at least $2.64 million from Cheetah Fund investors (subject to any offset for the minimal amount, if any, of compensation he earned) by transferring funds to his personal accounts.

5.      In January 2023, Allen told his investors that he was entering into a rehabilitation program. In fact, on information and belief, he initially fled the country.  Allen also confessed in text messages to a Cheetah Fund investor: "[W]e had continual losses. From [sic] trading and I reported gains . . . when we really

had losses . . . ." Allen further reiterated, "I reported gains when we had losses . . . I had to report gains or my family would have starved to death . . . ."

## VIOLATIONS

6.     Allen, by virtue of his conduct, directly or indirectly, has engaged in violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.105], and Sections 206(1), 206(2) and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6 (1), (2) and (4)] and Rule 206(4)-8 [17 C.F.R. § 275.206(4)-8] thereunder.

## JURISDICTION AND VENUE

7.     The Commission brings this action pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t], Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d)-(e)] and Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d)-(e)] to enjoin Allen from engaging in the transactions, acts, practices and courses of business alleged in this Complaint, and transactions, acts, practices and courses of business of similar purport and object, for a conduct-based injunction, for disgorgement of illegally obtained funds and other equitable relief, for civil money penalties, and for a permanent officer-and-director bar.

8.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d) and 77v(a)], Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

9.      The Defendant, directly and indirectly, has made use of the mails, the means and instruments of transportation and communication in interstate commerce, and/or the means and instrumentalities of interstate commerce, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

10.      Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14], because certain of the transactions, acts, practices and courses of business constituting violations of the Securities Act, Exchange Act, and Advisers Act have occurred within the Northern District of Georgia.  Defendant Allen at all relevant times lived and worked in the Northern District of Georgia. Both C.M. Allen Capital Management, Inc. (described below) and the Cheetah Fund were headquartered in the Northern District of Georgia.

## THE DEFENDANT AND RELATED ENTITIES

11.      **Craig Allen** is 53 years of age. He lived in Atlanta, Georgia, during the Relevant Period.  At least during the Relevant Period, Allen was the sole

shareholder, executive officer, and director of C.M. Allen Capital Management Inc. ("C.M. Allen"), which was the general partner of the Cheetah Fund. Allen was also the Cheetah Fund's portfolio manager and thus advised the fund.

12.    **C.M. Allen Capital Management, Inc.** was a Georgia corporation headquartered in Atlanta, Georgia. Georgia administratively dissolved the company in October 2020, though on information and belief Allen continued operating the company during the Relevant Period.

13.    **The Cheetah Fund L.P.** was a hedge fund that Allen formed in 1998, headquartered in Atlanta, Georgia. Its stated investment strategy was to make short-term trades, including both long and short positions. It is a Georgia limited partnership. The Cheetah Fund's last filing with the Georgia Secretary of State was in 2021; the fund's "Business Status" is listed on the Secretary of State's website as "Active/Noncompliance."

14.    Allen advised the Cheetah Fund as to the value of securities or as to the advisability of investing in, purchasing, or selling securities.  Allen managed the Cheetah Fund's securities portfolio. Allen also contracted to receive, and actually received, compensation for that advice.

15.    At all relevant times, Allen acted for and through the Cheetah Fund and C.M. Allen, as those entities' sole portfolio manager and principal.

16.     On information and belief, Allen drafted or approved all the documents and communications of the Cheetah Fund and C.M. Allen during the Relevant Period. As C.M. Allen's and the Cheetah Fund's sole principal and portfolio manager, moreover, Allen knew that the statements described below about the fund and its performance were false.

## FACTS

### A. The Cheetah Fund was a Pooled Investment Vehicle, and About 22 Individuals and Businesses Invested in the Cheetah Fund's Securities During the Relevant Period

17.     The Cheetah Fund was a pooled investment vehicle because it was, or held itself out as being, primarily in the business of investing, reinvesting, or trading in securities.

18.     In October 2007, Allen signed a Form D (i.e., "Notice of Sale of Securities Pursuant to Regulation D, Section 4(6), and/or Uniform Limited Offering Exception" (capitalization removed)), which was filed with the Commission. There, he described the Cheetah Fund as a "Private securities investment fund . . . ."

19.     The Cheetah Fund's limited partnership agreement provided that the "primary purpose and business of the [Cheetah Fund] Partnership [was] to acquire, purchase, invest in" or otherwise transact in "[s]ecurities directly and by investing

in other collective investment vehicles and managed accounts, with the intention of achieving appreciation of capital."

20.     During the period between approximately January 2019 and January 2023, about 22 individuals and businesses invested approximately $9.9 million in the Cheetah Fund, receiving limited partnership interests in that fund.  Those limited partnership interests were securities and were described as such by the Cheetah Fund's offering memorandum.

21.     The Cheetah Fund's investors depended on Allen (acting through C.M. Allen, the Cheetah Fund's general partner) to generate investment returns.

22.     The Cheetah Fund's offering memorandum stated explicitly that the "Fund's success [would] depend on the skill and acumen of Craig M. Allen and such other person as the General Partner [C.M. Allen] may employ . . . to develop and implement investment strategies that achieve the Fund's investment objective."

23.     The offering memorandum also stated that limited partners "will have no opportunity to select or evaluate any Fund investments or strategies[] . . . [which] will be determined by the General Partner," and that the "likelihood that Limited Partners will realize income or gain will depend on the skill and expertise of the General Partner [i.e., Craig Allen via C.M. Allen]."

24.     The limited partnership agreement itself generally gave investors no power to remove the general partner, C.M. Allen, and thus generally no power to remove Allen (though the agreement acknowledged that certain events would result in a general partner's removal, such as death or disability, bankruptcy, or the general partner's dissolution).

25.     The limited partnership agreement also stated "[t]he General Partner shall have the sole right and responsibility to manage and direct the business of the partnership."

**B. Allen Raises Money by Lying to Investors in the Cheetah Fund**

26.     During the Relevant Period, Allen sold the Cheetah Fund's limited partnership interests by making misrepresentations of material facts concerning the fund's performance.

27.     For example, when soliciting investments in the Cheetah Fund, Allen disseminated to at least some prospective investors (who thereafter invested in the Cheetah Fund) different iterations of a Cheetah Fund tear sheet, which Allen drafted or approved, on information and belief.

28.     The tear sheet was a short summary of the Cheetah Fund's strategy and performance and the terms for investing in the fund.

29.     In the tear sheet, Allen listed purported monthly and annual returns for past years.

30.     In one iteration that Allen disseminated, he represented that the Cheetah Fund had achieved a 73.24% annual performance in 2018.  In another iteration that Allen disseminated, he added a representation that the Cheetah Fund had a 48.82% annual performance in 2019.  And in a third iteration that Allen disseminated, Allen added a representation that the Cheetah Fund had achieved a 69.76% annual performance in 2020.

31.     In fact, the Cheetah Fund's supposed annual performance during those years was fictitious, based on trading records from pertinent accounts at the Cheetah Fund's prime broker. Upon information and belief, except for two small trades in 2018, the Cheetah Fund itself did not make any other trades in those years. Even if C.M. Allen's performance is included as the Cheetah Fund's performance, the boasts about performance were still fraudulent.  Although C.M. Allen did trade in brokerage accounts in its name, it lost money from 2018 to 2020.

32.     Also in the tear sheets, Allen attempted to fraudulently bolster the Cheetah Fund's credibility by representing that: (a) the fund had an "Auditor," listing an actual accounting firm; and (b) the fund and/or C.M. Allen had a specific, identified Chief Operating Officer (where the tear-sheet iterations sometimes used slightly different spellings of the same name).

33.     In fact, the referenced accounting firm never performed any audit services for the Cheetah Fund during the period from 2018 through the present

(though the accounting firm did assist the Cheetah Fund with the fund's 2018 tax return, which was filed on or about September 10, 2019).  In addition, the person identified as the Cheetah Fund's or C.M. Allen's Chief Operating Officer did not work with the Cheetah Fund during the Relevant Period.

34.     During the Relevant Period, Allen also, on information and belief, drafted (or approved) and disseminated to at least some prospective investors (who thereafter invested in the Cheetah Fund by purchasing its limited partnership interests) different iterations of a two-page narrative describing the Cheetah Fund's investment approach.

35.     In some iterations of the narrative that Allen disseminated, Allen boasted that the Cheetah Fund had "had considerable success in the last several years and particular success in the 2020 'Pandemic COVD [sic] World . . . .'"  One iteration of this "COVD" language then stated that the fund had taken "advantage of significant opportunity events throughout the course of the year," whereas another stated, "throughout the first half of the year."

36.     In another iteration of the narrative that Allen disseminated, he claimed that the Cheetah Fund "returned over 70% in 2018 . . . ."

37.     These statements about Cheetah Fund performance from 2018 to 2020 were false.  Based on records from pertinent accounts at the Cheetah Fund's prime broker, except for two small trades in 2018, the Cheetah Fund itself did not make

any other trades from 2018 to 2020.  The representations were false even if C.M. Allen's performance was included as the Cheetah Fund's.  In the first six months of 2020, C.M. Allen did have a relatively modest trading profit.  Beyond that short period, C.M. Allen lost money by trading in each year during the Relevant Period.

38.    Allen also lied to prospective investors verbally and via email.  For example, he boasted to prospective investors (who thereafter became investors) that the fund's existing investors included a specific former NFL quarterback or the quarterback's family (Allen's father-in-law).  But the former NFL quarterback and his family were not invested in the Cheetah Fund during the Relevant Period.

39.    As another example, on February 17, 2021, Allen emailed a potential investor, who later invested, stating, "The Cheetah fund is doing well this year and we had a great year last year."  In fact, on information and belief, the Cheetah Fund itself had not traded securities in the first month-and-a-half of 2021 or during any month in 2020.  Further, C.M. Allen lost about $129,915 through trading in January 2021 and had a realized net loss in 2020.

### C. Allen Sent Fake Cheetah Fund Account Statements and Tax Documents to Investors

40.    Throughout the Relevant Period, Allen, on information and belief, drafted (or approved) and disseminated fraudulent account statements to at least some Cheetah Fund investors, purporting to show frequent monthly gains in the

form of "Earnings."  As the Cheetah Fund's portfolio manager, Allen was aware at all times that the purported earnings were fictitious.

41.    Taking into account the trading Allen completed through C.M. Allen and the trading he completed through the Cheetah Fund, the account statements fraudulently inflated performance.  Based on records from the Cheetah Fund's prime broker, the Cheetah Fund (which traded during the period 2021 to 2023) and C.M. Allen (which traded during the period 2019 to 2021) incurred net realized trading losses every year during the Relevant Period, including approximate realized losses exceeding $1.86 million in each of 2021 and 2022.

42.    The Cheetah Fund and C.M. Allen also incurred realized trading losses in 36 of the 49 months in the Relevant Period.  In total, the Cheetah Fund and C.M. Allen incurred over $4.59 million in realized trading losses between January 2019 and January 2023.

43.    The fraudulent Cheetah Fund account statements led certain investors to invest more in that fund.

44.    For example, one investor victim ("Investor A") began 2021 with a $200,000 capital contribution invested in the Cheetah Fund.  Between January and July of that year, Cheetah Fund statements sent to Investor A showed that the account had an approximately 24% gain; that the account supposedly saw trading gains in 6 of 7 months; and that the account suffered a mere 1.52% loss in April.

45.     Subsequently, on August 13, 2021, Investor A emailed Allen: "I am very pleased with your work with this fund," and asked permission to invest more in the Cheetah Fund, which Allen allowed.  Investor A invested an additional $330,000 on August 20, 2021 (and a further $200,000 in December 2021 and $150,000 in March 2022).

46.     In fact, the Cheetah Fund and C.M. Allen had incurred a total of about $515,000 in net realized trading losses from January to July 2021 and had lost money every month except for a $193 gain in March 2021.

47.     Similarly, Investor B increased his Cheetah Fund investment from $150,000 to at least approximately $1.55 million between February 2021 and June 2022, after receiving fraudulent Cheetah Fund account statements indicating that the fund was performing well.  Investor B also convinced his brother to invest $200,000 in the fund.

48.     As a further example, on or around April 28, 2021, Investor C invested $250,000 in the Cheetah Fund.  In March 2022, Investor C invested an additional $250,000 in the Cheetah Fund (through a business he owned), after receiving a Cheetah Fund account statement showing a significant return on investment.

49.     Investor C's January 2022 Cheetah Fund account statement showed a cumulative gain of about 35.8% since his original investment.  His February 2022

account statement showed a cumulative gain of about 61.5% since the original investment.

50.      The gains were fictitious.  The Cheetah Fund had lost over $1.79 million between May 2021 and January 2022, and the fund had lost over $1.96 million between May 2021 and February 2022.  The Cheetah Fund lost money every month from May 2021 to February 2022.

51.      The Cheetah Fund account statements also helped lead at least one investor to introduce additional investors to the Cheetah Fund.

52.      In addition, Allen, on information and belief, drafted (or approved) and disseminated annual Schedule K-1 tax forms for the Cheetah Fund to at least some investors.

53.      In those tax forms, Allen represented that investors received annual business income from the fund, again indicating that the fund had generated trading profits during the year.

54.      At least some of those Schedule K-1s were fraudulent.  For example, two investors received K-1s for the 2021 tax year showing $225,104 and $146,562 in business income.  The K-1s' footnotes stated, "Line 1 [which is "Ordinary business income (loss)"] is income from active conduct of a business as trader of securities . . . . The income from the trading activity is considered ordinary income for the purposes of the investment interest expense deduction limitation."

55.     In fact, C.M. Allen and the Cheetah Fund actually incurred over $1.86 million of realized trading losses in 2021.  They suffered realized net losses every month except for a $193 gain in March 2021.

56.     In addition, on information and belief, Allen forged cover letters from a real accounting firm to accompany some of the K-1s, fraudulently bolstering the Schedule K-1s' supposed accuracy and truthfulness.

### D. Allen Misappropriated Funds from the Cheetah Fund or Its Investors and Misused the Fund's Assets

57.     The Cheetah Fund's offering documents for its limited partnership interests included a subscription agreement, offering memorandum, and limited partnership agreement.

58.     On information and belief, Allen drafted or approved those offering documents, and he disseminated them to at least some prospective investors (who later invested in the Cheetah Fund's limited partnership interests).

59.     The offering memorandum and partnership agreement detailed the limited circumstances when the Cheetah Fund would compensate Allen, through C.M. Allen.

60.     According to those documents, Allen would not receive a guaranteed management fee.  Instead, every six months (on June 30 and December 31), an investor would make an "Incentive Allocation" to Allen, but only if the net profit in a given investor's account since the last Incentive Allocation represented an

annualized return of at least 10%—after compensating for losses in prior periods, which were tallied in a Cumulative Loss Account.  Once returns reached that 10% hurdle, the documents stated, Allen could receive 20% of excess net profits (or a higher percentage, depending on the total excess net-profit amount).

61.    The offering documents also provided for limited expense reimbursements to Allen (through C.M. Allen).  Although the Cheetah Fund itself would pay or reimburse "reasonable expenses incurred in the operation of the Fund," C.M. Allen would otherwise "bear most of the costs of providing managing and administrative services" to the fund.

62.    According to the offering memorandum, if the "[Cheetah] Fund exceeded a 10% return Net to Limited Partners," then the fund would reimburse C.M. Allen for "Legal and Accounting expenses[.]"

63.    In addition to these representations, Allen effectively represented that he would use fund assets prudently for investment purposes.

64.    For example, Allen represented in the offering memorandum that the "Portfolio Manager [Allen] intends to be very selective with the Fund's holdings," and that "[w]hen the market does not afford opportunity, in the Portfolio Manager's view, then the Fund will be in cash. The Portfolio Manager will employ the assets of the Fund in the most profitable opportunities, whether long or short."

65.     The Cheetah Fund incurred net realized losses every year that it actually traded during the Relevant Period and during every six-month incentive-allocation term that it traded in the Relevant Period.

66.     Further, even assuming Allen was potentially entitled to compensation from the Cheetah Fund for trading he completed through C.M. Allen, C.M. Allen had no trading results that would have justified material compensation to Allen. C.M. Allen incurred net realized losses during all but one six-month incentive-allocation term in the Relevant Period.

67.     Specifically, from January to June 2020 (when the Cheetah Fund did not trade), C.M. Allen did have a $337,785 total net realized gain.  But C.M. Allen lost over $490,000 in the preceding incentive-allocation period (July to December 2019), and C.M. Allen also lost over $102,000 in the January to June 2019 incentive-allocation period.

68.     Using a conservative estimate based on the representations in the offering documents and the lack of profitable trading, Allen was entitled to a minimal amount, if any, of incentive allocation or legal-and-accounting fee reimbursement during the Relevant Period.

69.     Despite being entitled to minimal (if any) compensation from the Cheetah Fund, Allen misappropriated at least $2.64 million (subject to an offset for the minimal amount of compensation, if any, Allen actually earned) of Cheetah

Fund investor money through direct transfers and deposits from the fund to his personal bank accounts. This number represents the total amount transferred from Cheetah Fund accounts to Allen's personal accounts, less amounts transferred from his personal accounts to Cheetah Fund and C.M. Allen accounts.

70.    Allen used the money taken from Cheetah Fund investors to fund his lifestyle and to pay his and his family's personal expenses. Allen had relatively negligible other income.

71.    For example, during the Relevant Period, Allen spent over $422,000 for payments to personal credit card accounts, over $215,000 on private school tuition, over $101,000 on tuition and housing expenses for an apparent college-aged child, over $177,000 on rental expenses for the family's home, and over $15,000 for children's summer camps.  He also withdrew cash, made Zelle payments, and wrote checks to his immediate family in excess of $430,000. Additionally, from his personal accounts and charges to the C.M. Allen accounts, Allen spent over $145,000 on travel expenses, including trips to Beaver Creek, CO, Ponte Vedra, FL, Cancun, London, Paris, and Zurich.

72.    As a specific example of Allen's misappropriation from investors and misuse of investors' funds, between July and August 2021, the Cheetah Fund received a total of $2.395 million from two investors, representing virtually all the accounts' deposits in a four-month period.  Prior to the first investment in early

July, the Cheetah Fund bank balance was less than $1,000.  From the proceeds of the $2.395 million investments, over a four-month period, Allen made payments to two separate investors totaling $205,700 and wrote multiple checks to himself from the Cheetah Fund accounts totaling $388,500, which he deposited into his personal checking accounts.  He then used the funds to pay personal expenses, such as private school tuition, university expenses, dining, airfare, vacation expenses, clothing purchases, and an interior designer.

### E. Allen Admits Defrauding Cheetah Fund Investors

73.    On January 9, 2023, Allen emailed Cheetah Fund investors, stating that he was "entering an alcohol rehabilitation program" for 90 days, was going to the facility "immediately," and that he would therefore be "totally out of pocket."

74.    On information and belief, Allen instead initially fled the country.

75.    After the January 9, 2023 email, Allen exchanged text messages with Investor D.

76.    On January 13, 2023, Allen texted Investor D that "[W]e [i.e., the Cheetah Fund] had continual losses. From [sic] trading and I reported gains . . . when we really had losses . . . ."

77.    Allen again stated in a text to Investor D, "I reported gains when we had losses . . . I had to report gains or my family would have starved to death . . . ." Thus, Allen admitted that he inflated Cheetah Fund performance to justify,

fraudulently, taking incentive allocations and/or fee reimbursements from the Cheetah Fund.

78.    The next day, Allen offered a "confession of judg[ment]" to get "people money back," adding that he "can't do that in jail."

79.    On January 16, 2023, Allen admitted via text message to Investor D "there is no money left[,]" asking "why would I be talking about checking out with a gun if there were money left[?]"

80.    Allen also stated in a text message that if the "police/sec/fbi" were notified, there would be no recovery for investors and that he would "not be breathing" once found.

## COUNT I—FRAUD
## Violations of Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)]

81.    Paragraphs 1 through 80 are hereby realleged and incorporated herein by reference.

82.    During the period between at least approximately January 2019 and January 2023, Defendant Allen, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and/or communication in interstate commerce and/or by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

83.     Defendant Allen knowingly, intentionally, and/or with severe recklessness engaged in the aforementioned devices, schemes and artifices to defraud.

84.     By reason of the foregoing, Defendant Allen, directly and indirectly, has violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

**COUNT II—FRAUD**
**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**

85.     Paragraphs 1 through 80 are hereby realleged and incorporated herein by reference.

86.     During the period between at least approximately January 2019 and January 2023, Defendant Allen, in the offer and sale of the securities described herein, by use of means and instruments of transportation and/or communication in interstate commerce and/or by use of the mails, at least negligently, directly and indirectly:

a.  obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.  engaged in transactions, practices and courses of business

which would and did operate as a fraud and deceit upon the

purchasers of such securities; all as more particularly described

above.

87.    By reason of the foregoing, Defendant Allen, directly and indirectly,

has violated and, unless enjoined, will continue to violate Sections 17(a)(2) and

17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

### COUNT III—FRAUD
### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Sections (a), (b), and (c) of Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]

88.    Paragraphs 1 through 80 are hereby realleged and incorporated herein

by reference.

89.    During the period between at least approximately January 2019 and

January 2023, Defendant Allen, in connection with the purchase and sale of

securities described herein, by the use of the means and instrumentalities of

interstate commerce and by use of the mails, directly and indirectly:

a.  employed devices, schemes, and artifices to defraud;

b.  made untrue statements of material fact and omitted to state

material facts necessary in order to make the statements made, in

light of the circumstances under which they were made, not

misleading; and

   c. engaged in acts, practices, and courses of business which would
and did operate as a fraud and deceit upon the purchasers of such
securities; all as more particularly described above.

90. Defendant Allen knowingly, intentionally, and/or recklessly engaged
in the aforementioned devices, schemes and artifices to defraud, made untrue
statements of material facts and omitted to state material facts, and engaged in
fraudulent acts, practices and courses of business.

91. By reason of the foregoing, Defendant Allen directly and indirectly,
has violated and, unless enjoined, will continue to violate Section 10(b) of the
Exchange Act [15 U.S.C. § 78j(b)] and Sections (a), (b), and (c) of Rule 10b-5
thereunder [17 C.F.R. §§ 240.10b-5(a), (b), and (c)].

## COUNT IV—FRAUD
## Violations of Section 206(1) of the Advisers Act
## [15 U.S.C. § 80b-6(1)]

92. Paragraphs 1 through 80 are hereby realleged and incorporated herein
by reference.

93. During the period between at least approximately January 2019
through January 2023, Defendant Allen, acting as an investment adviser to the
Cheetah Fund, using the mails and/or the means and instrumentalities of interstate
commerce, directly and indirectly, employed devices, schemes and artifices to
defraud an advisory client and/or prospective client.

94.     Defendant Allen knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

95.     By reason of the foregoing, Defendant Allen, directly and indirectly, has violated and, unless enjoined, Defendant will continue to violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

**COUNT V—FRAUD**
**Violations of Section 206(2) of the Advisers Act**
**[15 U.S.C. § 80b-6(2)]**

96.     Paragraphs 1 through 80 are hereby realleged and incorporated herein by reference.

97.     During the period from at least approximately January 2019 to January 2023, Defendant Allen, acting as an investment adviser to the Cheetah Fund, by the use of the mails and the means and instrumentalities of interstate commerce, directly and indirectly, engaged in transactions, practices, and courses of business which would and did operate as a fraud and deceit on an advisory client and/or prospective client.

98.     By reason of the foregoing, Defendant Allen, directly and indirectly, has violated and, unless enjoined, will continue to violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT VI—FRAUD
## Violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 Thereunder [17 C.F.R. § 275.206(4)-8]

99.    Paragraphs 1 through 80 are hereby realleged and incorporated herein by reference.

100.    The Cheetah Fund was at all relevant times a pooled investment vehicle for purposes of Rule 206(4)-8 of the Advisers Act [17 C.F.R. § 275.206(4)-8].

101.    Defendant Allen was at all relevant times an investment adviser to a pooled investment vehicle, i.e., the Cheetah Fund, within the meaning of Rule 206(4)-8 of the Advisers Act. He managed the fund's securities portfolio and contracted to receive, and in fact received, compensation from the fund.

102.    Defendant Allen directly or indirectly, at least negligently, by the use of the mails or a means or instrumentality of interstate commerce:

    a.    Made untrue statements of fact and/or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in a pooled investment vehicle, the Cheetah Fund; and

    b.    Otherwise engaged in acts, practices, and courses of business that were fraudulent, deceptive, or manipulative with respect to

investors and prospective investors in a pooled investment vehicle, the Cheetah Fund.

103.   By reason of the foregoing, Allen violated and, unless enjoined, will continue to violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commission, respectfully prays that the Court:

### **I.**

Make findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendant Allen committed the violations alleged herein.

### **II.**

Permanently enjoin Allen and each of his agents, employees, and attorneys, and any other person or entity in active concert or participation with him who receives actual notice of the injunction by personal service or otherwise from directly or indirectly engaging in conduct in violation of the following provisions: Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), (2), and (4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8]; Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**III.**

Issue a conduct-based injunction that permanently enjoins Defendant Allen, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, from participating in the issuance, purchase, offer, or sale of any security, provided however, that such injunction shall not prevent Defendant Allen from purchasing or selling securities for his own personal accounts.

**IV.**

Issue an order, pursuant to Sections 21(d)(5) and (d)(7) of the Exchange Act [15 U.S.C. §§ 78u(5), (7)] and the Court's inherent equitable authority, directing Defendant Allen to pay disgorgement of all ill-gotten gains or unjust enrichment and to pay prejudgment interest on the amount ordered to be disgorged, to effect the remedial purposes of the federal securities laws.

**V.**

Issue an order requiring Defendant Allen, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) and 78u-1] and Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d), (e)] to pay civil monetary penalties.

**VI.**

Issue an order pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]

permanently prohibiting Defendant Allen from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

## VII.

Order such other relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## **JURY TRIAL DEMANDED**

The Commission demands a trial by jury as to all issues that may be so tried.

Dated: April 24, 2024

RESPECTFULLY SUBMITTED,

*/s/ M. Graham Loomis*
M. Graham Loomis
Regional Trial Counsel
Georgia Bar No.457868
loomism@sec.gov

William P. Hicks
Senior Trial Counsel
Georgia Bar No. 351649
hicksw@sec.gov

Joshua C. Hess
Counsel
GA Bar No. 371139
hessjos@sec.gov

United States Securities and Exchange Commission
950 E. Paces Ferry Road NE
Suite 900
Atlanta, GA 30326
404-842-7600


Attorneys for Plaintiff